# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 1254 | **DATE** | 7/15/2004 |
| **CASE TITLE** | RTC Industries, Inc. vs. William Merit & Associates | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/24/2004 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Defendant's motion (Doc 8-1) for partial summary judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JUL 15 2004 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 31 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | 2004 JUL 15 PM 2: 12 | date mailed notice | |
| SCT | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

RTC INDUSTRIES, INC., an Illinois )
corporation, )
)
             Plaintiff, )
)
   vs. ) 04 C 1254
)
WILLIAM MERIT & ASSOCIATES, INC., a )
California corporation, )
)
            Defendant. )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Defendant William Merit & Associates, Inc.'s ("WMA") motion for partial summary judgment. For the reasons set forth below, the motion is denied.

## BACKGROUND

Both WMA and Plaintiff RTC Industries, Inc. ("RTC") produce spring-loaded, product-pushing shelf divider systems that are sold to retail stores. These systems, mounted onto shelves in grocery, drug, and mass merchandise stores, have become increasingly popular in recent years. Once a row of products is loaded into the dividers, springs located in the dividers automatically force the products forward

towards the front of the shelf. When a customer removes a product from a row, the springs push the remaining products towards the front of the shelf. These systems not only ensure that a particular product is always at the very front of the shelf, but have been shown to increase sales, reduce labor costs (by keeping products neatly divided into separated rows), and prevent shoplifting.

RTC owns a patent, U.S. Letters Patent No. 4,830,201 ("the '201 patent"), which was issued on May 16, 1989, and is entitled "Spring-urged Shelf Divider System." WMA produces a shelf divider system known and sold under the name "Glide-Trak," which comes in two versions, Model 1 and Model 2 (the "Glide-Trak systems"). The Model 1 version has since been discontinued. On February 18, 2004, RTC filed suit in this court alleging that the Glide-Trak systems infringe on the '201 patent. WMA now moves for partial summary judgment, contending that Claims 1 through 8 of the '201 patent have not been infringed by the Glide-Trak systems.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." Id. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must consider the record as a whole in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. Id. at 255; Voice Technologies Group, Inc. v. VMC Systems, Inc. 164 F.3d 605, 612 (Fed. Cir. 1999). With these considerations in mind, we now turn to the present motion.

## DISCUSSION

Determining whether a patent has been infringed requires a two-step analysis. Dayco Products, Inc. v. Total Containment, Inc., 258 F.3d 1317, 1323 (Fed. Cir. 2001). First, the claims in question must be properly construed to determine their scope and

meaning, which is a matter of law. Id. at 1324. The second step is a determination of infringement, which is a question of fact. Id. A granting of summary judgment that the product in question does not infringe may occur only if there is no genuine issue as to whether the accused device is encompassed by the claims in dispute. Id. Non-infringement may be demonstrated by showing that a single material claim limitation of the accuser's patent is not found in the accused device. SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 859 F.2d 878, 889 (Fed. Cir. 1988).

For the first step of our analysis, claim construction, "the analytical focus must begin and remain centered on the language of the claims themselves." Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201 (Fed. Cir. 2002). "The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." Id. at 1202 (quotation omitted). In deciding the ordinary and customary meaning of claim terms, dictionaries, encyclopedias, and treatises may be employed by the court, as "these materials may be the most meaningful sources of information to aid judges." Id. at 1203. Because words often have multiple dictionary definitions, "[i]f more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." Id. Even though the intrinsic record, namely the patent's specifications,

must be examined in each case to determine whether the presumption of ordinary and customary meaning is rebutted, consulting intrinsic evidence as a "threshold step" before ascertaining the plain meaning of the claims' words "invites a violation of [Federal Circuit] precedent counseling against importing limitations into the claims." Id. at 1204. Furthermore, while dictionaries and other reference materials are the preferred choice for construing the meaning of claim language, other extrinsic evidence can be utilized by the court, such as the prosecution history and expert or inventor testimony. Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1308-09 (Fed Cir. 1999).

WMA contends that its Glide-Trak systems do not infringe on the '201 patent because three elements found in Claims 1 through 8 of the '201 patent are not found in the Glide-Trak systems. Because Claims 2 through 8 reincorporate Claim 1's description of a "shelf divider system," we will focus our analysis on the language of Claim 1, which is reprinted as follows:

A shelf divider system comprising:

An elongated channel mounting member operationally securable to a front portion of a shelf;

a shelf divider member slidably receivable in said mounting member so that the divider member extend rearwardly over the shelf;

track means on said divider comprising a pair of elongated rails, spring-urged pusher means comprising a pusher member having a front pusher face and a pair of flanges engaging said rails whereby said pusher member is operationally slidable on the rails and the pusher means is rearwardly retractable to accommodate a display of merchandise and will bear against the merchandise to automatically urge the same forwardly on the shelf.

WMA first argues that the Glide-Trak systems do not infringe on Claim 1 of the '201 patent because they do not contain a "divider member slidably receivable *in* said mounting member." (Emphasis added). This clause of Claim 1 describes how the spring-containing dividers on the '201 system (aligned perpendicular to the shelf's edge) are attached to the system's mounting unit, which is affixed to and runs along the front edge of the store shelf. The front of the '201 divider contains a "depending tongue" which extends downward in the direction of the shelf's surface. This depending tongue is then inserted into and constrained in a channel (shaped like a "U" or a rectangle missing its top side) in the mounting member in which the tongue is tightly held (in the words of the '201 patent, the tongue is "frictionally received and retained in the channel . . . of the mounting member"). Once the tongue is placed into the mounting member's channel, the snug fit keeps the divider attached to the mounting member.

On the other hand, instead of having downward extending tongues at the front of their spring-containing dividers, WMA's Glide-Trak systems' dividers (both Models

1 and 2) have downward facing C-shaped hooks ("C-hooks") attached to their front ends. These hooks fit tightly around tubes (in the shape of a narrow cylinder running parallel to the front of the shelf) that sit atop the Glide-Traks' mounting members. These tubes are physically part of the mounting member, but a raised bar connects the bottom of the tube to the surface of the mounting member. When the C-hook of the divider is locked around the tube of the mounting member, the divider becomes attached to the mounting member.

WMA contends that because the Glide-Trak dividers attach to their mounting members by securing the C-hooks around the mounting member's raised tubes, the Glide-Trak dividers are never "in" the systems' mounting members. Both parties are satisfied with the definition of the word "in" as stated in the Random House College Dictionary Revised Edition (1988): "(used to indicate inclusion within space, a place, or limits): *walking in the park*." We therefore will rely on this definition in determining whether the Glide-Trak divider members are slidably receivable "in" their mounting members. WMA's central argument is that the Glide-Traks' divider members attach to the mounting members via C-hooks that connect on or around a raised tube resting atop the mounting member rather than "in" the mounting member. However, preliminarily focusing on the differences between the features of the Glide-Traks and the features of the '201 patent (as written in the patent's description) *before*

determining the plain meaning of the disputed claim term would violate the two-step construction process outlined in Texas Digital. See Intellectual Property Development, Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1315 (Fed. Cir. 2003).

Because the parties agree the Random House definition of "in" is appropriate, we can next look to whether the '201's description rebuts or is inconsistent with the meaning of "in" in the 201's Claim 1, "for example whether [RTC] has specifically defined the term or otherwise limited the scope of the claim." Resonate Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1364 (Fed. Cir. 2003). The '201's specifications speak of a depending tongue that is to be "frictionally received and retained *in* the channel of the mounting member." (emphasis added). This description certainly is encompassed by the Random House definition, as it indicates the '201's divider member's tongue being within the space or limits of the mounting member. Under the Texas Digital framework, we see no reason to depart from the plain meaning of "in" that both parties agree is appropriately defined by Random House.

Because of the breadth and expansiveness of the definition of "in," we may not import the more specific limitations of the 201's written descriptions concerning a tongue being frictionally received and retained in the mounting member. Resonate Inc., 338 F.3d at 1365. Contrary to WMA's assertions, the question is not whether the

Glide-Traks are different from the '201 patent because the Glide-Traks' divider members attach to their mounts via hooks clamped around tubes rather than tongues inserted into channels. Instead, we must decide whether the Glide-Traks' divider members are slidably receivable[1] within the space or limits of their mounting members. In other words, do the Glide-Trak's dividing members enter the space of their mounting members via a sliding motion? Since the physical characteristics of the Glide-Trak Models 1 and 2 differ slightly, we will analyze each model separately.

On the Glide-Trak Model 1, the mounting member's tube (around which the divider member's C-hook attaches) sits atop the base of the member which itself rests directly atop the store shelf. The tube runs parallel to the ledge of the shelf, and sits on the portion of the mounting member furthest from the shelf's ledge. At the portion of the mounting member closest to the ledge, a one-half inch piece of plastic (the "Front Piece") extends back towards the tube at a roughly 45-degree angle. At its point furthest from the shelf's ledge, the Front Piece almost reaches the midpoint of the mounting member (in the direction from the front to back of the shelf) and does not reach as far back as the tube or the C-hook wrapped around it (if the divider member

---

[1] The ordinary meaning of "slidably receivable" does not appear to be in dispute. Random House (1988) defines "slide" as: "to move along in continuous contact with a smooth or slippery surface." Webster's Third New International Dictionary (1981) defines "receivable" as: "capable of being received." "Receive" is defined as "to take in or act - - act as a receptacle or container for."

is in place). WMA argues that the C-hook (and hence the dividing member) is not "in" the mounting member because it sits on top of the tube (the mouth of the "C" faces towards the shelf's surface). However, if one were to imagine a triangle with its sides being (1) the Front Piece (2) the mounting member's base (which sits directly on the shelf), and (3) and a line running from the edge of the member's base furthest from the shelf-ledge to highest tip of the Front Piece; a small portion of the C-hook would lie inside of the triangle.

We therefore hold that a question of fact exists as to whether the Model 1's dividing member sits within the space or limits of the mounting member. Because the C-hook can be attached to the mounting member's tube by lining up the C-hooks and running the tube through them (with the tubes moving though the C-hooks – which remain in continuous contact with the tube), a reasonable juror could find that the divider can be received by the mounting member in a slidable fashion. Since a portion of the C-hook is within the physical boundaries of the mounting member (as described above) as it slides over the tube, one could find that the C-hook is receivable "in" the mounting member. Summary judgment is thus denied as to WMA's contention that the Model 1's divider member is not "slidably receivable in" its mounting member.

As to the Glide-Trak Model 2, the mounting member's tube sits in a trough that is shaped like a "U" or a three-sided rectangle (with the top side missing).[2] The tube and the borders of this trough are all part of a single plastic structure that comprises the Model 2's mounting member. The tube sits entirely in this trough, meaning that the tube's highest point is below the highest point of the trough's vertical sides. When the Model 2's divider member is attached to the mounting member,[3] the C-hook (and thus part of the dividing member) rests almost entirely within the trough's boundaries. Once again, this means that a question of fact exists as to whether the Model 2 falls within the limitations of the '201 patent's claim of a divider member that is slidably receivable "in" a mounting member. Summary judgment on this claim element for the Model 2 is denied as well.

WMA next argues that the Glide-Traks do not infringe on the '201 patent's claims of having "track means on said divider member comprising a pair of elongated rails." This claim element describes the characteristics of the '201's divider member that allow the pusher member (the part of the device that urges merchandise towards

---

[2] This description is given from the perspective of looking down the length of the tube or through the eyes of the C-hooks, parallel to the shelf's edge.

[3] The Model 2's C-hooks attach to its mounting member's tube in the exact same manner as with the Model 1. Our finding as to the slidable receivability for both models is also the same.

-11-

the front of the shelf) to engage and move along the divider member (in the direction perpendicular to the shelf's edge). WMA asks that we adopt the following definitions, all taken from the Random House dictionary, in construing this claim element:

> "Track": 1. a structure consisting of a pair of parallel lines of rails with their crossties that provides a road for railroad trains.
> "Pair": 1. two identical, similar, or corresponding things that are matched for use together: *a pair of gloves*.
> "Rail[s]": 1. a bar of wood or metal fixed horizontally for any of various purposes, as for a support, barrier, fence, or railing.

WMA suggests that based on these definitions, along with language from the '201's specifications[4] and the patent's prosecution history, we should construe the claim element "track means on said divider comprising a pair of elongated rails" to mean "two parallel lines of bars that are mirror images of each other, used together and fixed horizontally for supporting and a providing a path that constrains the motion of the pusher member." In asking that we accept this construction, WMA emphasizes the railroad-like nature of the track along which the '201's pusher member rides. WMA's offered construction is descriptive of the '201: the track on which the '201's pusher rides is comprised of two parallel, horizontal and relatively flat bars that are completely symmetrical to one another (while looking down the length of the divider member –

---

[4] The '201's specifications speak of a "divider member comprise[d of] an elongated track having top and bottom rails respectively" and a divider comprised of "a track having horizontal side rails and a recessed horizontal wall."

-12-

perpendicular to the shelf's edge). WMA contends that because the mechanisms by which the Glide-Traks' pusher members remain engaged in and slide down the divider members lack such symmetry, there is no infringement on this element of the '201 patent.

In spite of WMA's assertion that the mirror-image railroad analogy offers the best construction of the disputed claim element, <u>Texas Digital</u> mandates that we first look to determine whether the words "track," "rail," and "pair" have other ordinary meanings – potentially broader than the ones propounded by WMA – on which our construction analysis should begin. Random House, WMA's chosen dictionary, also defines "track" as: "7. a course or route followed" or "9. a path or course laid out for some particular purpose." Under these definitions, a "track" need not be of the type on which trains run, but could also encompass a more general path or route on which something could travel. In addition, WMA's own definition of "pair" allows for the paired items that are to be matched for use together to not only be "identical," but "similar or corresponding" as well. Furthermore, the '201's specifications speak of the divider member being comprised of "a track having side rails," but do not elaborate that the track or rails need be of the mirror-image nature found on railroad tracks. Nor can such a limitation be construed from a close review of the '201's prosecution history.

Following Texas Digital's mandate that "[i]f more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings," 308 F.3d at 1203, we will adopt a more generalized construction for "track means on said divider comprising a pair of elongated rails": Two similar or corresponding plastic bars,[5] matched for use together, that run horizontally (in the direction perpendicular to the shelf's edge) with the purpose of guiding a pusher member down a fixed and defined path. This construction delineates the features of the '201's divider member that keep the pusher member in place as it moves merchandise down the shelf, but does not contain the railroad-like symmetry limitations that WMA asks us to read into the claim. Even if we had been able to ascertain such a limitation, the Federal Circuit's "proscription of not reading limitations from the specification into the claim," Texas Digital at 1205, supports our more expansive reading of the claim element at issue.

---

[5] Even though the Random House definition of "rail" speaks of a "a bar of wood or metal," the '201 is made almost entirely of plastic. However, under the Webster's New Twentieth Century Dictionary (1983) – also submitted by WMA – a rail may be "a bar of wood, metal, *etc.*," (emphasis added). This broadened definition of "rail" allows for a rail to be composed of materials other than wood or metal.

Having determined the scope of the claim element, we must next resolve if a question of fact exists as to whether the Glide-Traks' "track rails"[6] infringe on the claims of the '201. On both Glide-Trak models, a narrow wall (the "Left Wall") of plastic (as viewed when looking down the length of the divider member from the front of the shelf) runs the entire length of the divider member.[7] Roughly half-way up the height of the Left Wall, a thin strip of plastic (the "Center Strip") is attached to the wall and runs the full length of the divider member, parallel to the member's base. At the right end (looking from the shelf front) of this strip is a second wall (the "Right Wall") that runs parallel to the Left Wall the full length of the divider member. The highest points of the Right and Left Walls are connected to each other by a piece of plastic that is the same width and thickness as – and runs parallel to – the Center Strip. However, the Right Wall only extends downward from the Center Strip roughly half the distance from the Center Strip to the member's base. The member's base, the Center Strip, and the Left and Right Wall constitute the boundaries of the path on which the left-most

---

[6] WMA admits that the Glide-Trak systems have track rails. Def. Reply at 6 n.6.

[7] Photographs of the Glide-Traks' divider members can be seen on Pl. Mem. at 12. However, these photographs show the Glide-Traks as seen from the rear of a store shelf.

-15-

portion of the pusher-member[8] rides back and forth along the length of the divider member.

The Left and Right Walls are not identical mirror images of each other, as the Right Wall does not extend to the divider member's base. However, a reasonable juror could reach the conclusion that they are two matched plastic bars that run horizontally (from the front to the rear of the shelf) and are intended to guide the Glide-Traks' pusher members down the length of the divider members. As such, we cannot hold that, as a matter of law, the Glide-Traks do not contain "track means on said divider member comprising a pair of elongated rails."

WMA finally argues that we should hold that the Glide-Traks do not infringe on the '201 patent's claim of having "a pusher member having . . . a pair of flanges engaging said rails."[9] This claim element describes the aspects of the 201's pusher member (a flat vertical surface that urges merchandise along the divider member towards the shelf's edge) that fits around the divider member's rails and allows the pusher to remain in continuous contact with and ride along the divider member's track rails. WMA offers two dictionary definitions of "flange" that are not disputed by RTC:

---

[8] This portion of the pusher member will be analyzed in greater depth below.

[9] WMA does not dispute that both Glide-Trak models contain "pusher members." Our analysis will therefore focus on whether the pusher members contain a "pair of flanges engaging said rails."

-16-

Random House (1988): 1. a projecting rim, collar, or ring on a shaft, pipe, machine housing, etc., cast or formed to give additional strength, stiffness, or supporting area, or to provide a place for the attachment to other objects.

Webster's New Universal (1983): 1. a raised or projecting edge, rib, or rim, for strength, as in a T-rail, for guidance, as on a rail to keep wheels in place, for connection with some other object, as in some pipes.

WMA asks that we adopt the Random House (1988) definition of "engage" and interpret the word to mean: "8. *Mech.* To cause (gears or the like) to become interlocked; to interlock with." While RTC points to other dictionary definitions for "engage," that support a significantly broader reading of the term, for the sake of argument we will accept WMA's proffered definition. That being said, Webster's Third New International Dictionary (1981) defines "interlock" to mean: "to engage or inter-relate with one another . . . to connect in such a way that the motion of any part is constrained by another part." This definition is consistent with a '201's claim of its flanges allowing the pusher member to be "operationally slidable on the rails" of the divider member. However, as was discussed in our analysis of the rails, there is nothing in the ordinary meaning of the language of the claim, or in the specifications, to suggest that the "pair" of flanges be identical or mirror images of one another.

We thus construe "a pusher member having . . . a pair of flanges engaging said rails" to mean: A pusher member having two similar or corresponding projecting rims

or edges that interlock or connect with the rails for the purpose of constraining and guiding the pusher member along the rails. This definition aptly describes the portion of the '201's pusher member that connects it to the divider member's track rails (by surrounding the top, bottom, and outer edge of each of the two rails) and restricts the pusher member's motion to moving either up or down the rails.

On both Glide-Trak models, the left-most (viewed from standing before the store shelf) portion of the pusher members contain two narrow strips that are aligned and run in the same direction as the divider members' Left and Right Walls. The left-most strip (the "Left Strip") is of a certain thickness such that it is slightly thinner than the space between the Left and Right Walls. In fact, the pusher member becomes connected to the divider member by sliding the Left Strip into the space between the Left and Right Walls of the divider member. When the pusher member is inserted into the divider member, the divider member's Right Wall occupies the space between the Left and Right Strips of the pusher member. When the Left and Right Strips are interconnected with the Left and Right Walls, the path of the pusher member is limited to moving back and forth along the length of the divider member.

As with the Glide-Traks' track rails, their pusher members' Left and Right Strips are not symmetrical. However, they are coupled with the purpose of connecting with the divider members' rails to restrict the pusher members' motion to run only forward

or back along the divider members. We accordingly hold that a reasonable juror could find that the Glide-Traks' pusher members contain "pair[s] of flanges engaging said rails." This remaining ground for partial summary judgment is thus denied.

## CONCLUSION

Based on the foregoing analysis, WMA's motion for partial summary judgment is denied.

_____
Charles P. Kocoras
Chief Judge
United States District Court

Dated: JUL 1 5 2004